## Case No. 10,277.
### The NIPHON'S CREW.
[1 Brunner, Col. Cas. 577; [1]  13 Law Rep. 266.]
Circuit Court, D. Massachusetts.  Oct. Term, 1849.

SEAMEN—WAGES—WHEN EARNED—SALVAGE.

The crew of a ship abandoned at sea, and set fire to by order of the master, who were upon monthly wages, cannot recover wages up to the time of abandonment, although the vessel, freight, and earnings be fully insured, and certain articles (for which the crew received a compensation in the nature of salvage) were saved.

[Appeal from the district court of the United States for the district of Massachusetts.]

This cause comes up by appeal from the decree of the judge of the district court dismissing the libel. The suit was in personam for seamen's wages against the owners of the ship Niphon. The libelants were mariners of said ship, on a voyage from the Sandwich Islands to Nantucket, on monthly wages. The vessel sailed on the 5th August, and was abandoned at sea on the 13th January, off the coast of the United States, on account of a dangerous leak caused by perils of the sea, and was set fire to by order of the master. The crew were taken off by another ship and brought into port, bringing with them the chronometer, certain charts, the compasses, certain sails, and the boat. The owners had a full insurance on the vessel, her freight and earnings. The libelants, eight in number, claim wages to the amount of $50.15 each, being up to the time of abandoning the vessel. The respondents, the owners of the vessel, appeared and gave stipulation, and agreed to submit the question to the court upon the argument of the counsel for the libelants, the libel being taken pro confesso, and the following additional facts being agreed; viz., the chronometer and charts were sold for fifty dollars, of which the libelants have received their share. The other articles saved are retained by the owners of the vessel that took off the crew, who claim them as a gift from the master of the Niphon, and for salvage.

The district court, after a hearing, dismissed the libel, and an appeal was taken thence to this court.

Richard H. Dana, Jr., for libelants.

[2][To disembarrass the case, we will, at first treat it as one of total loss of ship, cargo and freight, by foundering at sea, the crew performing duty faithfully, but able to save nothing. Are the owners personally liable for wages? The general principle applicable to contracts for labor, is that compensation follows the faithful performance of duty. If wages are not due here, it is owing to an exception peculiar to the seaman's contract for wages. Judge Ware, in

1 [Reported by Albert Brunner, Esq., and here reprinted by permission.]
2 [From 13 Law Rep. 266.]

The Dawn [Case No. 3,666], says, "Upon the common principles of the contract of hiring service and labor, the title of the laborer to his reward depends on the faithful performance of the service for which he is engaged, and is not liable to be defeated by the accidents of fortune." So, Judge Sprague, in The Massasoit [Id. 9,260]. We are here met with the maxim, "Freight is the mother of wages." There is nothing in jurisprudence more remarkable than the history of this maxim, its uncertain origin, its precarious life, and its lingering but certain death. It is not found in the codes of commentaries of continental Europe, nor did it originate in the admiralty courts or treatises of England or America. It is first discovered in the English common-law reports, among obiter dicta, though even there it has never been decided that the converse of the maxim is true, viz., that where there is no freight there can be no wages. When the early editions of Abbott on Shipping were published, there had been no decision to that effect (Abb. Shipp. [3d Ed.] p. 435), and Lord Stowell, in deciding the case of The Neptune (1 Hagg. Adm. 232), says, "It by no means follows, universally, e converso, that where no freight is due, no wages are due." The English common-law cases turned chiefly on the wording of the contracts, which were almost always so contrived by the masters and owners, as to make the wages depend upon the safe arrival of the vessel at specific ports. Appleby v. Dods, 8 East. 300; Cutter v. Powell, 6 Term R. 320; Hernaman v. Bawden, 3 Burrows, 1844. In the American cases there is a good deal of confusion. arising from a mistaken deference to this maxim. Judge Kent held that wages were lost with freight, and where cargo only was saved by the seaman. and no freight was due, he considers that they are to have salvage and not wages. Dunnett v. Tomhagen, 3 Johns. 156; 3 Kent, Comm. 195. Judge Peters, on the other hand, in the case of Weeks v. The Catherina Maria [Case No. 17,351], gave wages. as such, when the vessel and freight were lost, but the crew saved portions of the cargo. Obliged to admit that the crew had no lien on the cargo for wages, where no freight was due, he puts the case on the ground of contract services entitling them to the contract compensation. And again, in the case of Giles v. The Cynthia [Id. 5,424], he speaks of seamen as entitled to wages out of the "vessel or cargo saved." though freight is lost, provided they did their duty in saving as much as possible. In the case of Taylor v. The Cato [Id. 13,786], however, he says that "freight and wages are lost by the wreck," and that the seaman. by doing his duty by saving vessel and cargo, "in a new character, as a salvor, regains a rightful claim to wages." He distinctly states the rule to be that cargo as well as vessel are pledged for this new species of salvage

wages, lest the crew should neglect the cargo; but he cites no authority for the distinction. Judge Hopkinson, in the Sophia [Id. 65], where the cargo and freight were lost, and portions of the wreck were saved by the crew, gave wages, eo nomine; but he said that the wreck dissolved the contract, yet that if materials of the vessel are saved by the meritorious exertions of the crew, the claim for wages is revived. So in the case of The Hercules [Id. 1,762] he gave wages as such.

[Judge STORY, in The Saratoga [Id. 12,-355], said, obiter, that in the case of freight lost and materials of the vessel saved, the crew had wages, as such, and not salvage. He afterwards had occasion to examine the question more fully, in the case of The Two Catherines [Case No. 14,288.] In that case the cargo and freight were lost, and materials of the vessel saved by the exertions of the crew. Judge Story unfortunately deferred to the supposed rule, and held that wages as such could not be given, but gave wages in the nature of salvage, saying, however, that "if the question were entirely new, it might, perhaps, be more consistent with the principle of the rule, that the earnings of wages shall depend on the earning of freight, to hold that the case of shipwreck constituted an exception from the rule, and that the claim to wages was fully supported by the maritime policy on which the rule itself rests."

[The question first arose in England, in the case of The Neptune, 1 Hagg. Adm. 227, before Lord Stowell. In that case the cargo and freight were totally lost, and materials of the vessel saved by the crew. After full arguments, this learned judge, better acquainted, probably, with the ancient and modern civil and maritime law than any judge who has presided in admiralty in England, in an elaborate opinion, decided that wages as such were due. He holds that the seaman is obliged by his contract to save and guard the wreck, and is to receive wages not for these particular services in saving, but for having fulfilled his contract. He says, "In performing that duty he assumes no new character, he only discharged a portion of that covenanted allegiance to the vessel, which he contemplated and pledged himself to give in the very formation of that contract which gave him his title to the stipulated wages." Judge Story afterwards approved of this doctrine, and says, in a note to Abbott on Shipping (page 752, Ed. 1846), with reference to The Two Catherines [supra], "The court then thought that the rule upon the authorities had not been construed as liable to such an exception, and therefore put the allowance of wages in cases of shipwreck on the grounds of a qualified salvage." See, also, Pitman v. Hooper [Case No. 11,185.]

[The next case was that of The Massasoit [Id. 9,260], in this district. That case

was precisely like The Neptune, except that the materials of the wreck were not, in point of fact, saved by the crew. The wreck occurred in winter, under distressing circumstances, and for two days the seamen were unable to perform any salvage services, and the wreck was taken in charge by agents of the underwriters. Judge Sprague sustained the doctrine of The Neptune, and held that it was enough if the crew were willing to aid in saving and guarding the materials, being prevented by sickness, or by the act of the owners in procuring other aid and dispensing with their services.

[The next case was that of The Reliance, 2 W. Rob. Adm. 119. There was a total loss of cargo and freight, and the vessel perished, and the crew in her. The suit was brought by the administratrix of a deceased seaman against the owners personally. The counsel for the defense distinguished the case from that of The Neptune, by the fact that no part of the vessel was saved. The learned judge admitted the distinction, but shows clearly that Lord Stowell did not put the case of The Neptune' on the ground of salvage services, but of faithful performance of contract. He states that portions of the wreck of the Reliance were saved by strangers, and had come into the owner's hands, but were not, and could not have been, saved by the crew. He decreed wages to the time of the death.

[The rule which made wages depend on the earning of freight may now be considered as overthrown. In the case of The Neptune, materials of the vessel were saved by the efforts of the crew. In the case of The Massasoit [supra], materials of the vessel were saved, but not by the crew, they, however, being ready to do all in their power; and the proceeding was in rem, to enforce a lien. In the case of The Reliance, not only was the saving of materials done by strangers, on a foreign coast, but the crew perished before salvage services could be rendered. These decisions bring the rule precisely to the case now in hearing, except that (as we have assumed) no materials are saved. Is then the fact of the accidental saving of a few materials by strangers, the vessel being specifically destroyed, and the enterprise entirely defeated, essential to the personal obligation of the contract on the owners? It may be remarked, that there is nothing in the language of the court, nor in the decision, in either The Reliance or The Neptune, indicating that the fact of salvage being made is essential. On the contrary, the reasoning is all such as would make the contract mutually obligatory, whether materials were saved or not. In the case of The Reliance it cannot be supposed, for a moment, that the liability of the London owner to the representative of the deceased seaman, depended on the fact that a stranger on the French coast picked up a few dollars' worth of old iron, or a spar, ac-

cidentally thrown ashore, perhaps days after the crew had perished. The reasoning in the case of The Massasoit would extend over this case, but, as the proceeding was in rem, the personal liability was not considered. Let us, then, examine the only proposition which can prevent our recovery. It is this: If a vessel is destroyed, freight and cargo lost, and the enterprise defeated, yet seamen are entitled to wages for the voyage if they have performed their duty, although they have saved nothing, provided some portion of the wreck happens to be saved by other means. No one will pretend that such a rule is founded in natural justice. No case can be found in any book where it has been laid down; nor is it in the code of any nation, ancient or modern. Neither is it founded on any sound rule of policy. The reason given for the supposed rule of freight was, in the words of Judge Ware, to "make the right [to wages] dependent on the successful issue of the enterprise, for which the men are hired;" and of Judge Sprague, "to unite the interest of the mariner with that of the owner." It will be found, too, on examining the codes of European nations, that, wherever they have introduced this exception to the law of hiring, it has been in such a way as to identify the interest of the seaman with that of the employer, depriving him of wages if the enterprise failed. Wherever they have refused wages, they have also dissolved the contract; and whenever they have given compensation from the wreck, it has been in consequence of salvage services actually performed by the seamen.

[In order to gain all the light possible on the subject, I have examined carefully that treasury of the maritime laws of all ages and nations, Pardessus' Lois Maritimes, and a careful reading of this work shows how little foundation there is in history for this odious exception. There is no trace of a rule making seamen's wages dependent upon the success of the voyage, in the laws of the Rhodians, or of the Roman or Greek empires, nor in the codes adopted by the Crusaders for the government of their conquered countries in the East. It is not to be found in any of the Italian commonwealths whose commerce filled the world in the Middle Ages. That universally received standard of maritime law, the Consolato del Mare, shows no trace of it. Judge Ware, in the case of The Dawn [Case No. 3,666], says, "No trace of such a principle is to be found in the Roman law, nor in the maritime legislation of the Eastern empire, nor in that ancient compilation which goes under the name of the 'Rhodian Laws.' It owes its origin to the necessities and peculiar hazards which maritime commerce had to encounter in the Middle Ages, when to the danger of the winds and waves were added the more formidable dangers of piracy and robbery." The laws of Spain (Ordonnance Maritime de 1340, art. 17; 5 Pard. 357) provide that in case of wreck the seamen shall

aid without loss of time, saving the ship, furniture, cargo and merchandise on board. "Dans ce cas, les matelots et autres employés doivent recevoir leur loyers, jusq'au moment ou le patron leur dira de cesser leurs fonctions." But if they shall desert, and not aid in saving ship and cargo, "nonseulement le temps qu'ils auront servi ne leur sera pas compté, mais encore ils devront rende ce qu'ils auront reçu pour avances ou paye." It also provides that any seaman who shall refuse to aid in saving shall be imprisoned until he pays his advanced wages. The laws of the Hanse towns are as explicit as those of Spain. The Recés de 1434, art. 3 (2 Pard. 474), treating of wreck, provides as follows: "The seamen are bound (seront tenus) not to leave the master without his permission, but to aid in saving the ship and cargo, and to remain by him so long as he furnishes them support, and for their labor they shall receive a just salvage compensation, according to the circumstances, as well as their wages and venture, conformably to the law of the sea,— "un juste salaire de sauvetage, suivent les circonstances, ainsi que leurs gages et portées conformément au droit de la mer." The next ordinance of the Hanse towns, that of 1591 (2 Pard. 520, art. 45), repeats the obligation of the seamen to remain and aid in saving both vessel and cargo, for which it provides they are to receive a proper compensation; but if the master has no money, he shall return them to the place where they shipped, if they wish to follow him. If they do not assist, he is not bound to pay them their wages, nor any other compensation; as translated by Pardessus, "il sera dispensé de leur payer leurs gages ni aucum autre salaire." The Ordinance of 1614, tit. 4, art. 29 (2 Pard. 543), is to the same effect, except that it adds imprisonment in case of failure to aid in saving. In the same ordinance (title 9, art. 5), there is a provision which is somewhat doubtful. It is as follows: "If enough of the wreck is saved to pay the wages of the crew, the master shall be bound to pay them in full." As there is nowhere in the laws of the Hanse towns an intimation that wreck forfeits the wages, but on the contrary (supra, Reces de 1434, art. 3), and the obligation to labor is clear, we must suppose that this provision relates to the right the crew have to be discharged and paid off on the spot, when their services are no longer needed, provided the master has the means of doing it; and does not imply that the owners or merchants, or even the master, are absolved from their obligation to pay finally. It is like the provisions of the Hamburg Code of 1497, art. 21, that when a master sends home a seaman, without fault on his part, he shall pay him half his wages. See, also, Ord. Phil. II. below. The law of the Netherlands is explained by the ordinance of Phil. II., in 1563 (4 Pard. 84), art. 12. In case of wreck, "The seamen are bound to aid the master in saving the cargo, to the best of their ability.

In which case, and in any other, the master is bound to pay them on the spot, if he has money, what he owes them for their wages, and shall also pay them, on account of the merchandise saved, a reasonable salvage compensation. If he has not money enough to make this payment, he shall send them to the place where the ship belongs." The law of Genoa, decree of 1441 (4 Pard. 519), cc. 94, 99, makes it the duty of seamen to labor after as well as before the wreck, and obliges the master to pay them double their contract wages while they are employed in salvage services. The law of the States of the Church, Statutes D'Urban, rub. 33 (5 Pard. 144) inflicts the punishment of banishment and loss of a hand upon a sailor who deserts his ship in time of wreck, and makes it his duty to labor in salvage, "aider au sauvetage," for fifteen days, if required. The "Us et Coutumes D'Olonne," pt. 1, art. 22 (6 Pard. 553), after requiring the seamen to remain and labor, require the master, when he dismisses them, to give them a written discharge, "in order that they may prove to the owners of the ship that they did not leave without permission."

[The following are believed to be all the passages relating to this subject in the laws of Hamburg, Lubec, West Capelle, Wysburg, Riga, and Denmark. In examining these passages, the court will be struck with certain facts. It is nowhere stated, in terms, that the contract is dissolved or that wages are lost by the wreck. Nor is the contrary stated. But, in this silence, which way should the presumption be? Can there be a question that it should be in favor of the general principle, rather than of the exception, especially when the exception is contrary to natural equity, and admitted to have had no place in the laws of earlier days, and of other great commercial nations of the same day? It will be observed, too, that these codes distinguish between wages and salvage and recognize no principle like that of wages in the nature of salvage. Where salvage is given, it is irrespective of prior earnings, but is given for actual salvage services, pro opere et labore, according to the circumstances of each case. And no distinction seems to be made between vessel and cargo, as respects either the duty of the crew to save, or their right to wages, or the allowance of salvage. Hamburg: Decree of 1603 (3 Pard. 385), tit. 17, art. 1. In case of wreck the crew are bound to aid in saving cargo and materials, receiving an equitable compensation; if they refuse their assistance, the master shall pay them neither their wages, nor any thing else; "le patron ne leur paiera ni loyers ni rien autre chose." The same article is found in the decree of 1497. Lubec: Third Code (published by Brokers) art. 295 (3 Pard. 418). "In case of wreck the seamen are bound to aid the merchant in saving his cargo, as much as is in their power, and they shall receive a just compensation; provided, that if

they cannot agree with the master and merchant, it shall be decided in the first Hanseatic town at which they arrive, or at the first place in which there is a chamber of commerce, and they shall be paid, each according to his desert, by the master and merchant present at the wreck. He who has not labored in salvage shall receive nothing." Ditto, art. 305 (3 Pard. 422), inflicts a punishment of two months' imprisonment on any seaman who refuses to assist in saving from the wreck; and branding, with three months' imprisonment, for the second offence. The Ordinance of 1542, art. 24 (3 Pard. 431), inflicts the penalty of death. Ordinance 1586, tit. 3, art. 3 (3 Pard. 444). "In case of wreck, the master and crew are bound to aid, to the best of their ability, to save the goods of the freighter, who shall be bound to pay them equitably for their labor, according to the advice of arbitrators. But if the freighter and the crew cannot agree upon the amount of the compensation, it shall be decided at the first Hanse town at which they arrive, or the first place where there is a chamber of commerce; and each one shall be paid according to his desert. Whoever has not labored, shall receive nothing, and in addition thereto his wages shall be forfeited." West Capelle: Judgment 3 (1 Pard. 372). "If a ship is wrecked in any country whatever, the crew are bound to save and guard the cargo to the best of their ability. If they have assisted the master, to the best of their ability, in saving the cargo, he is bound to pay them ('shuldig hen loon te geven,' which Pardessus translates, 'est tenu de leur payer salaire'), and if he has not the money to pay them, he must take them home. If they do not aid, he owes them nothing, and they lose their wages, as the ship is lost." Riga: Statute of 1672, tit. 5, art. 1 (3 Pard. 522). In case of wreck, "the crew are bound to aid (in saving the cargo), on pain of losing their wages; and they shall have a reasonable compensation for their labor in making salvage." Denmark: Code, Fred. II. (1561) art. 24 (3 Pard. 250). "In case of wreck, the master and crew are bound to save the ship and her furniture, as well as the cargo, and compensation shall be made them by the decision of arbitrators. On the other hand, the freight of the cargo saved, as well as the wages of the crew, should be paid pro rata itineris, according to the decision of arbitrators. The seaman who will not aid in saving ship, furniture and cargo, shall lose his wages, even the advance which he has received, and he shall be regarded by all seamen as infamous." Ditto, art. 52 (3 Pard. 259), establishes the rule that in case of partial loss of cargo, the crew shall not receive their entire wages, but according to the amount of cargo saved, in the proportion of the freight which the master receives. The Code of Christian V. (1683) c. 3, art. 1 (3 Pard. 288), is the same with that of Fred. II., cited above. But the same Code, c. 4, § 8 (3 Pard.

298), enacts that "if the cargo and materials of the vessel saved, deducting charges of salvage, is not sufficient to pay the wages of the crew, they shall demand nothing farther." Wysburg: Laws of, art. 17 (1 Pard. 471). "In case of wreck, the crew are bound to save the cargo to the best of their ability. If they aid the master in saving, he owes them their wages. If he has no money, he may pledge the cargo saved, to return them to their own country. If they do not aid him in saving, he owes them nothing, and they lose their wages." Some editors add, "in the same manner as the ship is lost." It will be seen that none of these codes give any countenance to the doctrine that, in case of wreck, seamen are to get no wages, except from the materials of the vessel. And the only code which seems to make the wages depend upon the amount saved, that of Denmark, subjects the cargo to the lien for wages which has never been done in this country, and it denied the principle of Pitman v. Hooper, that wages in full are to be given, if sufficient freight is earned to pay them.

[The law of Sweden (Statute of Wysburg, A. D. 1254, c. 12; 3 Pard. 120) established the rule that if half freight or less was earned, in case of wreck, the seamen should receive half wages; if more than half freight, whole wages. A later statute, that of Car. XI. (1667) pt. 5, c. 2 (3 Pard. 170), is the first we have yet seen which establishes the rule of obtaining wages only from the materials of the vessel. "When the ship and cargo are totally lost, the master and crew can demand nothing of what is due them. But if they save materials to the amount of their wages, they shall be paid in full."

[There is no question that the law of France establishes, by positive enactment, the exception we contend against. The ordinance of 1681, lib. 3, tit. 4, art. 8 (4 Pard. 365), enacts, "En cas de prise, bris et naufrage avec perte entiere du vaisseau et des merchandises, les matelots ne pourront pretendre aucuns loyers, et ne seront neantmoins tenus de restituer ce qui leur aura este avance." Article 9 enacts, "If any part of the vessel is saved, the seamen engaged for the month or voyage, shall be paid their wages earned from the materials they have saved, and if cargo only is saved, they shall be paid their wages by the master, in the proportion of the freight which he receives. And in whatever way they are hired, they shall, in addition, be paid by the day, for their labor in saving the materials." The French Code follows the ordinance of Louis XIV. See volume 18, p. 278, art. 259 et seq. The French commentators have consistently held that the wreck dissolves the contract, and that the seamen are not bound to labor in saving vessel or cargo. 1 Valin, Comm. p. 704; 2 Poth. Cont. p. 230. And the French carry this system of attaching contracts to the vessel, and exonerating owners, so far that they exempt the

owners from personal liability to material men, if the ship perishes on the voyage home. French Code, lib. 2, tit. 8, "Des Proprietaires," art. 1; Emerig. Ins. tom. 2, p. 458. Article 3 of the Laws of Oleron has been cited by the French writers as containing the principle of their code. The passage is as follows: "Lorsqu'un navaire perit en quelque lieu que ce soit, les matelots sont tenus de sauver le plus qu'ils pourront des debris et du chargement. Et s'ils y aident, le patron doit leur payer un salaire raisonable, et le frais de conduite dans leurs pays, autant que le valueur des choses sauves peut suffire, et s'il n'a pas assez d'argent, il peut mettre les objects sauves en gage pour se procurer de quoi les ramener en leur pays. Si les matelots refusent de travailler au sauvetage, il ne leur est rien du, et au contraire, quand le navire se perd, ils perdent aussi leur loyers." The meaning of this passage is matter of inference. The French writers, trained under their code, have inferred that the wages were lost at all events by the wreck, and have construed the latter clause as only referring to the known rule. And the French writers have been the chief sources of information to our own jurists. But when we consider that such a rule did not exist at all in early times, nor in the Mediterranean, nor among nations following the Roman law, and when we remember the great influence these nations exerted on the maritime law of the North at the time the rules of Oleron were compiled, we should rather infer that the latter clause in this section was a specific recital that wages are forfeited for refusal to continue the performance of duty after wreck, in pursuance of the general principle of forfeiture for gross violations of duty. It is clear that Sir Wm. Scott, in the case of The Neptune, either did not give this section the French construction, or did not think it, if so construed, applicable or binding in England at the present time. Mr. Curtis, also, in his work on the Rights and Duties of Merchant Seamen, does not consider the construction as clear. Curtis, Rights & Duties, 284.

[Having thus examined these foreign codes, let us see what result is obtained from them. The French code makes the wreck, with destruction of the enterprise, a dissolution of the contract. The seaman is entitled to day's wages as a salvor, and his lien upon the materials of the vessel for antecedent wages is reserved to him. This code, except so far as it is followed by that of Charles XI. of Sweden, and to some extent by that of Denmark, stands alone. All the other codes insist on the obligation of the seaman to continue his labor, doubtless under the direction of the master, and for the benefit of vessel and cargo alike. The French code allows him to follow his lien on the materials of the vessel if he pleases since he has no lien on the cargo. It is a significant fact, also that the two codes which adopt this exception are the only codes which in terms continue to the seaman his lien on the wreck of the vessel for antecedent wages. Not that the lien did not exist under the other codes, but because it was needless to provide for its continuance when the contract remained entire. The French principle is not adopted either in America or England (see The Neptune, The Massasoit, and The Reliance [supra]); on the contrary, the seamen are held bound to labor under their contract; and now the declaratory act of 7 & 8 Vict. c. 112, gives wages to the time of the wreck, if the crew continue faithfully the performance of their duty. See, also, 1 Colonial Ord. Mass. 1668, p. 721, § 29. "And, in case of suffering shipwreck, the mariners are, without dispute, upon getting on shore, to do their utmost endeavors to save the ship or vessel, tackle and apparel, as also the merchant's goods, as much as may, out of which they shall have a meet compensation for their hazard and pains; and any upon conviction of negligence herein shall be punished." If bound to labor under their contract, it must be under the direction of the master, and for the preservation of cargo and vessel alike, or for either alone, at the master's option. They may be compelled for the benefit of the owners, to sacrifice their lien on the materials, and to labor for the cargo alone, on which they have no lien, or at most only to the extent of freight that may be due upon it. If such is the obligation of the seaman, why is it not mutual? The owner is surely bound to furnish him food and lodging while he is laboring, and why not wages? If the contract is binding on the seaman to the extent above stated, and not binding on the owner as to compensation, it presents a most extraordinary anomaly. The French have involved themselves in no such inconsistency. There is no evidence of it in other European systems. The cases of The Neptune and The Reliance were both proceedings in personam, as we understand the reports; and, if not, the owners are required to pay on the ground of contract, and not of salvage in their possession. The whole reasoning of the court would exclude any such illogical and unjust exception.

[The idea that the contract is binding upon the seamen, but that they have no claim for wages, except their lien on the materials of the vessel (an idea which has not taken the shape of a decision since the case of The Neptune), arises from not discriminating properly among the codes and systems of Europe. The European systems have been treated as a whole, and a rule found in the French code has been joined with principles and analogies from the laws of other nations, to which it is inapplicable, and a confused, inconsistent, and unjust composition made up. The publication of the work of Pardessus has thrown a new light upon the maritime systems of Europe, and shown them to have been quite variant. If we follow the French rule, we should follow it throughout; and, if we follow the general rule, we must not introduce

the French exceptions. But, supposing this rule, which we contend against, was more general than we have supposed, during the Middle Ages, there are reasons why it should not be followed now. In those periods, voyages were short, ports of discharge frequent, and the wages at stake small. Now, vessels go round the world, and when they near the home port, the wages at stake are large. Then, the crew were partners in the enterprise, and had a voice in the control of the vessel and choice of the master, and often an interest in the freight. The court is familiar with those rules which require the master to consult the crew before going to sea, or making jettison, or abandoning the wreck. Now, the crew are merely hired laborers, and have no voice in the control of the vessel. The reasons of public policy now are against the rule, as shown by the court in the case of The Massasoit. It may be said that the obligation of the owner, in the case of The Reliance, rests on the ground of his having received the proceeds of the wreck saved. It will be observed that the court did not put the obligation on that ground, although there was an opportunity to do so, but on the ground of contract. And there was no allegation to that effect in the libel. Nor does it appear that the net salvage was sufficient to pay the wages, nor was any provision made for others of the crew who might claim out of the same fund; nor any allusion to the apportionment of the fund. We would not lightly suppose the court to adopt so anomalous a position as this; sustaining, first a one-sided contract, all obligation and no compensation, and then reviving it by the accident of net salvage from the vessel, coming through the hands of a stranger. But chiefly we insist that no authority can be found for the position, that while seamen are bound to labor in salvage, under their original contract, and as part thereof, for vessel and cargo, either or both at the master's option, they have no claim for wages but in consequence of their lien on the materials of the vessel saved. No decision and no code has yet combined these principles. It will be observed, too, that if the claim for wages rests solely on the subsistence of their lien on the vessel, it should, on principle, exist as to all materials saved, whether by themselves or others, or saved by accident; but the two codes above referred to, those of Louis XIV. and Car. XI. the only ones that establish this rule in terms, both restrict the lien to materials which the seamen have themselves saved; showing that it is rather an arbitrary and local rule of policy, than the recognition of a general principle.

[The only American cases that need be noticed, before closing this branch of the argument, are Lewis v. The Elizabeth and Jane [Case No. 8,321], and The Dawn [supra]. The former case was decided before The Neptune, and the learned judge, like Judge Story in The Two Catherines, sup-

posed the rule to be that wages depended upon the earning freight; or, as he stated it, that "wages are dependent on the successful termination of the voyage;" "any misfortune that destroys the voyage, puts an end to the claim for wages. The contract is dissolved. The connection of the crew with the ship is at an end. The property is derelict," &c.; and again, "wages are dependent on the safe delivery of the thing." It is enough to say that this doctrine is overruled by the later cases. It will be observed, too, that the learned judge had not then access to the collection of European codes since made by Pardessus, and relied chiefly on the French code and the French construction of the rules of Oleron; yet even from that point of sight, he admits the confused and unsatisfactory state of the law. The case of The Dawn was decided after The Neptune, but before The Massasoit and The Reliance. In that case the wages were paid to the time of the wreck, and the only question was whether salvage could be given in addition to wages. The learned judge takes up, obiter, the general question of wages in case of wreck, and while he yields the groundwork of his decision in the Elizabeth and Jane, to the authority of The Neptune, yet he seems to retain all that The Neptune does not necessarily overthrow. We can only say that, had the point been before him for decision, we have no doubt he would have gone more fully into the considerations of policy that govern the question, and examined more minutely the European codes on that point. As it is, it is evident that he repeats so much of the old doctrine as was not then overturned, and does not sufficiently consider the position in which the connection of the two systems, the new piece in the old garment, leaves the entire fabric.

[We have, thus far, assumed this to be a case of total loss. But it appears that a boat, chronometer, compass, and some charts were saved by the crew, and brought into port. Their services and duty, therefore, continued after the wreck. There is no doubt, upon the principle of The Massasoit and The Reliance, that the crew were bound to guard these relics, and deliver them in safety to the owners; and, in performing this duty, they were under the master's control. The contract and its obligations survived the wreck. But, if the seamen have wages only on the ground of materials which have come into the owners' hands, it is to be observed that the fund is not exhausted. These libellants have received only their share of the $50 obtained from the sale of the chronometer and charts. Are they not entitled, as first claimants, to exhaust the fund? Moreover, there is property to the value of $100 in the hands of the owners of the ship which took off the crew, who make a claim upon it as a gift from the master, and for salvage. If the master has given it away, should not the owners make it good to the crew? If it is held for salvage,

must not the owners discharge the claim, and pay at least the net to the crew? In this case the master ordered the crew to leave and set fire to the ship. This shows the hardship of continuing the authority of the master, yet leaving to the seaman only his lien. If there is such a rule, the crew had a right, if they chose, to stay by the ship. At least. on the principle of lien, they would be entitled to enforce their lien if the vessel had been brought in by others, and their leaving was compulsory. The act of the master cut them off from both these chances of saving their wages. The owners have also, in this case, an insurance on vessel, cargo, and freight. I am aware it was formerly held that this could not inure to the benefit of the crew. But this doctrine was on the hypothesis that the wages were attached to the success of the enterprise. If this rule is abandoned, and the principle is adopted, that the owners are liable for wages after wreck, in consequence of proceeds of the wreck received, why should not this include insurance on vessel and freight? In either case, it is the fact that the owner has a fund to pay from, that makes him liable, and in either case the owner may resist payment by showing that the seaman did not faithfully perform his duty at the time of the wreck. But the reason of public policy, which forbids seamen from insuring their own wages, still subsists, for the master and owners cannot then be parties to resist the claim for wages, to show misconduct or negligence, or to make offsets. In the present state of the law, then, we submit that, while seamen should not be permitted to make an independent insurance of their wages, yet, if the owners have insured vessel or freight, meritorious seamen should be paid their wages out of that fund.][2]

WOODBURY, Circuit Justice. In this case, as no freight has been earned, it is well known that the general rule is, no wages are to be paid. Moll. 245; 1 Sid. 228; 2 Show. 291; 3 Salk. 23; 3 Hagg. Adm. 96. But there are various exceptions to this as a general rule, and the chief inquiry is, whether, on the facts of the present case, it can be brought within any of those exceptions. The important principle on which the rule rests shows the ground of most of the exceptions. It rests on the idea that if a cargo be on board to be carried safely and saved in peril. the crew should be induced to use all possible exertion to save it, by making their wages in such a case depend on its being actually preserved, and thus freight earned on it. Hence originates the quaint maxim that "freight is the mother of wages." Some have incautiously added, it is "the only mother of wages." If it was the only one there is no ground whatever for the present libel, as it is not

[2] [From 13 Law Rep. 266.]

pretended here that any freight whatever was earned.

What. then, are the other sources or reasons for wages beside earning freight? They seem to me to rest on service performed. and an inability to earn freight, in consequence of some wrong or neglect by the owner or his agents. In such cases the owner should not take advantage of his own misfeasance or nonfeasance; and the sailor performing his whole duty, so far as regards his own exertions, and successfully, should be compensated.

A brief retrospect of some of the exceptions to the general rule will show whether the present case can be brought within the principles which govern them; and also whether any of them go further than I have suggested, and, as is contended here for the libellants, make the owners liable for wages on the contract of hiring and ordinary service alone, without reference to the conduct of the owner, or the saving of any part of the freight or vessel when in peril. Among the exceptions where wages are allowed, though no freight is earned, is where no cargo is put on board so that freight might be earned. Not earning it, then, is the neglect or fault of the owner; and consequently such a case constitutes one of the exceptions to the general rule. See cases, post, and Edw. Adm. 118, 119; Curt. Merch. Seam. 271, 284, 287; Laws Wisbuy. art. 17; 3 Hagg. Adm. 202; 2 Hagg. Adm. 158. This rests not merely on the original contract as the mother of wages, but on the service and freight not earned by the misconduct or act of the owner, and of which he is estopped to take any advantage. It would be making the exception the general rule to hold the contract in all cases to be the mother of wages, unless you considered it an implied portion of every contract of this kind, that it should be so performed when a cargo was on board as to earn freight. Then the contract might well be regarded as the general source of wages, and still the same result follow as if freight was so regarded. As an exception, owing to carelessness of the owners, or the case at times coming within the general rule of some freight earned, they are personally liable for wages when the vessel and cargo have been condemned, and their proceeds restored at some subsequent period. Sheppard v. Taylor, 5 Pet. [30 U. S.] 699, 711. No matter whether the vessel and cargo are restored, or their proceeds, after condemnation as the lien which before existed for wages "reattaches to the thing, and to whatever is substituted for it." [Sheppard v. Taylor] 5 Pet. [30 U. S.] 710; Pitman v. Hooper [Case No. 11,185].

In several other classes of cases, though no freight is actually earned, this circumstance is attributable to the owners, rather than the crew, and then the latter are not to bear the loss of wages. They may then be recovered of the owners. if, for instance. the latter are guilty of a wrongful deviation from their

contract or voyage before the loss, or guilty of a contraband trade, or of driving the crew away by cruelty, or engaging, without their previous knowledge and consent, in any illegal voyage; or by running in debt, and subjecting the ship to payment of it. 1 Hagg. Adm. 238; [Sheppard v. Taylor] 5 Pet. [30 U. S.] 687; Edw. Adm. 122; The Malta, 2 Hagg. Adm. 158; The Saratoga [Case No. 12,355]. In short, wages are payable whenever freight is lost by the fault or fraud of the master or owner. 3 Kent, Comm. 187; Hoyt v. Wildfire, 3 Johns. 518; The Malta; Wolf v. The Oder [Case No. 18,027]; Cowen, 158. But here, as a cargo was on board, and it was here impossible to earn freight, and there was no interposition or neglect, or other misconduct by the owners to prevent the carrying of freight, the general rule applies in full force not to pay wages without it. And no statute exists here making an exception; and no exception by adjudged cases has been referred to or can be found which reaches the circumstances of the present case, unless a part of the vessel was saved by the exertions of these libellants, so as to entitle them to wages in the nature of salvage.

Having considered the established exceptions to the general rule, and seen that none of them, or the principles of them, apply to the present case, I will now proceed to the inquiry, how, on principle or precedent, the saving of a part of the vessel can entitle a crew to recover wages, though freight was entirely lost by the loss of the cargo on board, and though no misbehavior or neglect occurred on the part of the owners to produce the loss. There has been, to be sure, in modern times, an increased tendency to allow wages, but it should be when it can be done without weakening the principle that takes the lead in and governs this subject. Thus, if wages are due because part freight has been received, or earned, or part of the cargo has been saved, so as to earn some freight, however small, full wages must be paid. Pitman v. Hooper [supra]; 3 Hagg. Adm. 199; 2 W. Rob. Adm. 52. Some cases seem to hold (The Reliance [2 W. Rob. Adm. 120]; 3 Hagg. Adm. 19, 58) that the owner is, in case of part of the cargo saved, not only liable, but that the seamen may proceed against the cargo itself. This last is very doubtful, however, unless the cargo was owned by the person who owned the vessel. Again, where in a round voyage freight has been earned out, and not back, the law is indulgent so as to pay wages out of it; and such is the rule also when freight has been separately earned to intermediate ports, at which the vessel touches on her way out or home. 3 Hagg. Adm. 201; 1 Hagg. Adm. 232. Or, at times, it is allowed to the last port of discharge, and half the time running there. Thompson v. Faucett [Case No. 13,954]; Pitman v. Hooper [supra], and cases cited; The Juliana, 2 Dod. 504; Abb. Shipp. 749; Bronde v. Haven [Id. 1,924]; Curt.

Merch. Seam. 267; The Two Catherines [Case No. 14,288]; 3 Greenl. Ev. 1; 1 Keb. 831; 3 Salk. 23. All clauses to the contrary in the shipping articles are likewise considered void, from regard to the confiding sailor, so much the ward of a court of admiralty. 2 Dod. 504; 3 Kent, Comm. 6, 194, 195; 6 Wm. IV. c. 19, § 5; Edw. Adm. 119; Pitman v. Hooper [supra].

In some countries, by statute, the law has of late been expressly altered, and wages required to be paid, though the cargo and ship be lost, and no freight earned, if a certificate be obtained from an officer that the crew did their duty faithfully to save the vessel and cargo. Edw. Adm. 123; 7 & 8 Vict., c. 112, § 17. But here no such statute exists, though one might not be unjust, where the weather-beaten sailor proves true to duty to the last, and more especially if the owner has, as here, insured his freight. Having no such statute here, our power to consider it so, standing with or without insurance of freight, is too questionable for justifying the adoption of such a course without legislative sanction after the pursuit of a different course for ages. In The Lady Durham, 3 Hagg. Adm. 201, Sir John Nicoll refused to do it, unwilling, as he said, "to violate a principle and rule of law, whatever may be the hardship on the seamen." The court there declined to pay wages out of the insurance of freight by the owner, where freight was not earned, nor prevented by the owners.

How can the saving of a part of the vessel change any of these principles? The wages were not stipulated to depend on that, nor did the ancient usage make them depend on that, when it was the cargo or freight saved or secured, which was to secure wages, and not the ship. To be sure, when wages were earned by earning freight, or failing to earn it only by the neglect or fault of the master, the crew could resort to the vessel, even to the last nail or plank, for payment. Relf v. The Maria, [Case No. 11,692], note; 7 Taunt. 319; The Saratoga [supra]; Edw. Adm. 121, 128; The Neptune, 1 Hagg. Adm. 233–239. So they could resort to the freight when obtained, as a fund liable to them, and so to the owners who employed them, if wages are earned. But the lien or remedy does not usually extend to the cargo itself, neither to the cargo or its proceeds, as they belong usually to a different person. The Riby Grove, 2 W. Rob. Adm. 59, 713; Edw. Adm. 119. See Act. Cong. July 20, 1790 [1 Stat. 131]; The Lady Durham, 3 Hagg. Adm. 200. And if the cargo be owned by the owners of the vessel, and it is safely carried to its place of destination, freight is virtually earned, though not eo nomine, and wages are justly due within the principle of the general rule. 3 Kent, Comm. 149. But the vessel, as a security and a remedy for wages otherwise due, and not as a mother or cause of wages, if

saved, is also looked to in all countries. Curt. Merch. Seam. 313;. The Eastern Star [Case No. 4,254]. The error seems to me to have been, in some cases, to regard the vessel, when saved in part or in whole, as giving a title to wages; when it is freight earned, or prevented by the owner from being earned, which consummates the title, and the vessel saved furnishes merely some additional security for payment, and in some cases means of rewarding exertion by salvage. Thus, in modern times, if only a small portion of the ship be saved in a shipwreck, it has been subjected towards the claims of the crew in the form of salvage, though no freight was earned. Curt. Merch. Seam. 287; 3 Kent, Comm. 196; The Two Catherines [supra]; The Saratoga [supra.] But in such case the crew must have continued by the wreck, and contributed to save it; and the allowance is not on the old contract or hiring, but on this new service. Lewis v. Elizabeth and Jane [Case No. 8,321]; Adams v. The Sophia [supra]; The Reliance, 2 W. Rob. Adm. 121. Sometimes it is treated or talked of as a receiver of wages in consequence of great fidelity, though no freight is earned, but this seems a misnomer. It is merely salvage and not wages; but whether paid as salvage or wages it does not extend beyond the value of what is saved. The Neptune, 1 Hagg. Adm. 237; 3 Mass. 563; 7 L. R. 532; The Dawn [supra].

It was·held in the case of Taylor v. The Cato [Case No. 13,786,] that the crew may recover an equivalent for wages from a vessel saved by them, like salvage, and not go to the owner for it, but to the rem. If all is lost seamen lose all, salvage as well as wages. But if a part of the ship is saved by the crew, they, as a sort of partners, have the first lien on it for salvage. Relf v. The Maria [supra]; The Mary, 1 Caines, 180 [Farrel v. M'Clea] 1 Dall. [1 U. S.] 392; The Nathaniel Hooper [Case No. 10,032]. The books speak of attaching this claim to the last plank saved. But this may at times be figurative, and not the small things of which lex non curat. It should mean to embrace something of value towards payment, which must therefore be beyond mere costs and charges. Figurative or not, however, it appears better on principle if not precedent, to treat the claim as salvage, where no wages have, by the general rule, or any of its established exceptions, been earned. The precedents on this point accord with this principle. And though some of them speak of wages as well as of salvage, yet they all agree in not extending the amount allowed beyond the value of what is saved, which is the rule in salvage and not in wages. In Frothingham v. Prince, 3 Mass. 563, it was held that if enough of the ship was saved to equal the wages, they should be paid, though no freight had been earned. As this case cited no precedents, and gave no reasons, it ̇would

not, standing alone, be entitled to much weight. Accordingly, in The Saratoga [supra], it was considered that the decision was an anomaly so far as regards wages, and could only be sustained as an allowance. for salvage exertions, equal in amount and value to the wages.

Afterwards, however, in England and this country, much caution has been given to this doctrine, as to wages or salvage. In The Neptune, 1 Hagg. Adm. 239, the court allowed wages to be recovered to the extent of the value of that part of the vessel saved, but no further. 3 Hagg. Adm. 202. Some cases in the courts of the United States have since gone quite to the same extent. Two Catherines [supra]; Pitman v. Hooper [supra]. See Bronde v. Haven [supra] and The Easter Star [supra], also. Yet in all these the exception must probably rest on the fact of the property being saved by the exertion of the crew, and not saved by others, and not claimed justly by others as salvage. See cases before cited. The case of The Reliance, 2 W. Rob. Adm. 123, is supposed by the libelants to have gone further, and to have held that if a part of the vessel was saved by the others the crew had a remedy against it or the owners for wages. But though the court there seemed very favorable to the claim made by a widow of one of the crew, and when her husband had been lost in the exercise of efforts to save this very vessel; yet they do not seem inclined to go beyond the previous case of The Neptune, in 1 Hagg. Adm. And the conclusion was rested on the fact that the deceased did in truth contribute by his exertions before˙his death to save a part of the vessel, though others afterwards added their exertions, and thus finished the work of saving something.

In the present case no part of the vessel itself was saved, and no special exertion shown to stop a leak which had broken out. But the crew thereupon abandoned her, and were taken off by another vessel. The other vessel took with them from the wreck a chronometer and certain charts, which have beeen sold since, and the proceeds given to the libelants; but some compasses, sails, and a boat were taken off at the same time by the other vessel, and retained and claimed for salvage as well as a gift from the master. Considering that these articles were saved entirely by the exertions of another vessel and crew, who are entitled to salvage, and that the captain acquiesced in their taking and keeping them on that account, and that their small value of one hundred dollars would scarcely pay the cost and expenses of libeling them, it is difficult to discover any equitable or legal claim on them by the plaintiffs.

On all these considerations, cases, and facts, then, the conclusion seems safest, to which the court below arrived, dismissing the libel. and the decree there must consequently be affirmed.